IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RICHARD W. HORNUNG and | ) | Case No. 09-51461 |
| KRISTIN L. HORNUNG, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| | ) | |

**MEMORANDUM OPINION**

This matter came before the Court on January 26, 2010 upon the Motion of Bankruptcy Administrator for Dismissal of Case Pursuant to Sections 707(b)(1) and 707(b)(3) (the "Motion to Dismiss"), filed by the United States Bankruptcy Administrator on October 20, 2009. At the hearing, Brian P. Hayes appeared on behalf of the above-referenced debtors (the "Debtors") and Robert E. Price, Jr. appeared on behalf of the Bankruptcy Administrator. After consideration of the Motion to Dismiss, the evidence presented at the hearing, the arguments of the parties, and the relevant law, the Court will grant the Motion to Dismiss.

**I.  JURISDICTION**

The Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157 and 1334, and the General Order of Reference entered by the United States District Court for the Middle District of North Carolina on August 15, 1984. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(A), which this Court has the jurisdiction to hear and determine.

## II.  FACTS

In April of 2006, the Debtors listed their house for sale after entering into a contract for the purchase of a new house.  On March 16, 2007, the Debtors closed on their new house, despite not having sold their previous one.  The Debtors financed the purchase of their new house with two interest-only loans, both of which were secured by deeds of trust on the house.[1]  The Debtors did not make a down payment toward the purchase price.

For the next fifteen months, the Debtors continued to market their former house for sale.  They made numerous improvements in an effort to sell it, such as new paint, granite countertops, and new carpeting, totaling in excess of $8,900.00.  During this period, the Debtors made both mortgage payments and paid all utilities on both houses.  They did not rent their former house to supplement their income.  On June 30, 2008, the Debtors completed a short sale on the house, which required them to contribute more than $3,000.00 to the closing.

Throughout the construction of the new house and up until August 2008, the male Debtor was employed as an information technology manager at TIAA-CREF.  He earned an annual salary of $115,000.00 plus bonuses.  The female Debtor has not worked since the birth of their first child in 2006.  In 2007, the male Debtor reported wages of $122,897.00.  In early August 2008, the male Debtor lost his job at TIAA-CREF, and, as a consequence, received a severance package that included several weeks of salary and a prorated bonus.  According to the Debtors' bank statements, between August 14, 2008 and September 12, 2008, the male Debtor received

---

[1] The terms of the first note require the Debtors to pay $348,387.29, with interest-only payments at a rate of 6.25% for the first ten years and the payment of principal and interest commencing on May 1, 2017.  The terms of the second note require the Debtors to pay $83,360.00, with interest-only payments at a variable rate until the end of a ten-year draw period and the payment of principal and interest commencing thereafter.

approximately $40,468.93 in net income after tax withholdings. By this time, the Debtors had accumulated approximately $20,000.00 of credit card debt. In late September 2008, the male Debtor found new employment at System Maintenance Services, Inc. as a regional sales manager. The male Debtor earns an annual salary of $87,000.00 plus overtime, commissions, and bonuses. He is also reimbursed by his employer for various expenditures, including mileage, meals, and office supplies. The male Debtor earned more than $100,000.00 in 2009.

Subsequent to the sale of their previous house, the Debtors purchased a timeshare with Disney Vacation Development for approximately $32,000.00. This obligation required monthly payments of approximately $335.00 plus annual homeowners' association dues of $960.00. Although the Debtors contracted to buy the timeshare in July of 2008, just prior to the male Debtor's loss of employment, it is unclear whether the Debtors closed on their purchase of the timeshare before or after the male Debtor was laid off. In December of 2008, the Debtors withdrew approximately $2,000.00 cash to fund a family vacation to Disney World. The Debtors vacationed again in Disney World after they filed their petition.

During the first week of July 2009, the Debtors met with their attorney to discuss filing for bankruptcy protection. On July 11, 2009, the Debtors purchased two new vehicles.[2] The first vehicle was a 2009 Ford Fusion with a purchase price of $26,989.21 and a monthly payment of $397.22. The second vehicle was a 2009 Ford Edge with a purchase price of $42,114.94 and a monthly payment of $619.84. Together, the monthly payments on the new vehicles were $1,017.06. The male Debtor testified that they purchased the vehicles, based on the advice of

---

[2]The male Debtor testified that the vehicles were demo vehicles with approximately 4,000 miles on each car. However, the dealership still classified the cars as new because neither vehicle had ever been titled to another purchaser.

their attorney, to lower their monthly vehicle payments. Prior to purchasing the new vehicles, the Debtors had leased a 2007 Ford Explorer and a 2008 Ford Expedition. The monthly payments on the leased vehicles totaled $1,337.18.

On July 23, 2009, the Debtors filed their Chapter 7 bankruptcy petition. The Debtors' schedules reflect an outstanding indebtedness on their home of $441,799.00. The Debtors valued the home on Schedule A at $420,000.00. The tax value of the home is listed at $449,040.00. Schedules I and J show that the Debtors have monthly income of $6,068.67 and expenses of $6,000.02, resulting in monthly net income of $68.65. According to Schedule J, the Debtors' two mortgage payments total $2,985.36, including taxes and insurance. In addition, each month the Debtors spend $443.88 for utilities,[3] $37.50 for homeowners' association dues, and $112.50 for home maintenance. At the hearing, it was adduced that the Debtors spend an additional $33.00 each month for pest control services and $36.95 each month for a security system, neither of which were listed on the Debtors' schedules. The Debtors' monthly housing expense totals $3,649.19, which is approximately 60% of their monthly net income at that time. According to Schedule F, the Debtors owe $31,432.37 to their unsecured creditors, consisting primarily of credit cards and lines of credit. The Debtors' current monthly income as reflected on line 12 of Form B22 is $8,789.19. The Debtors' total expense deductions listed on line 47 of Form B22 are $9,360.33, resulting in a monthly disposable income of negative $571.14.

On October 20, 2009, the Bankruptcy Administrator filed a Motion to Dismiss based on Section 707(b)(3) of the Bankruptcy Code. The Bankruptcy Administrator argues that the purchase of two new vehicles on the eve of bankruptcy shows a lack of good faith under Sections

---

[3]Utilities include electricity and heating fuel, cable television, and internet service.

707(b)(3)(A) and (B). The Bankruptcy Administrator also argues that the Debtors have an excessive budget and an ability to repay their debts, and that they made consumer purchases far in excess of their ability to repay.

### III. DISCUSSION

The Bankruptcy Administrator seeks dismissal of the Debtors' case pursuant to Section 707(b)(3) of the Bankruptcy Code. Abuse of the Bankruptcy Code occurs under Section 707(b) when a debtor attempts to use the provisions of the Code to get a "head start" rather than a "fresh start." Green v. Staples (In re Green), 934 F.2d 568, 570 (4th Cir. 1991) (providing that § 707(b) allows "a bankruptcy court to deal equitably with the situation in which an unscrupulous debtor seeks to gain the court's assistance in a scheme to take unfair advantage of his creditors"); In re Jarrell, 189 B.R. 374, 377 (Bankr. M.D.N.C. 1995) (Chapter 7 is intended to give "the truly needy a fresh start, not to give those who can afford to meet their obligations a head start.") (citing In re Grant, 51 B.R. 385, 394 (Bankr. N.D. Ohio 1985)); In re Pilgrim, 135 B.R. 314, 317 (C.D. Ill. 1992) (§ 707(b) is one of "more than 30 amendments to ensure that a 'fresh start' does not become a 'head start'.") (floor statement of Sen. Hatch, 130 Cong. Rec. S. 8891 (June 29, 1984)). For Section 707(b) to be applicable, the debts in the case must be primarily consumer debts, and it must be shown that granting the debtor a Chapter 7 discharge would involve an "abuse" of the provisions of Chapter 7. It is undisputed that the debts in this case are primarily consumer debts. The moving party, in this case the Bankruptcy Administrator, has the burden of proving abuse pursuant to Section 707. In re Sale, 397 B.R. 281, 284 (Bankr. M.D.N.C. 2007).

Section 707(b)(1) of the Bankruptcy Code prescribes two alternative standards to determine whether the granting of relief would be an abuse. First, Section 707(b)(2) provides

5

that abuse may be presumed if, under a "means test" formula, the Debtors' 60-month disposable income exceeds a particular threshold amount.[4]  Second, Section 707(b)(3) provides that, even if no presumption of abuse arises, a court may still dismiss a case based upon the particular circumstances of the case.  The Bankruptcy Administrator does not assert that the Debtors failed the means test of Section 707(b)(2), so the Court need only address whether there is a basis to dismiss the case under Section 707(b)(3).

Section 707(b)(3) requires a court to consider "(A) whether the debtor filed the petition in bad faith; or (B) [whether] the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse."  Unlike the pre-BAPCPA version, "§ 707(b)(3) does not require a showing of 'substantial abuse,' but a lower standard of 'abuse.'"  In re Mondragon, No. 05-10665, slip op. at 1 (Bankr. D.N.M. Aug. 24, 2007) (2007 WL 2461616); In re Mestemaker, 359 B.R. 849, 856 (Bankr. N.D. Ohio 2007).  The Bankruptcy Administrator alleges that the granting of relief would be an abuse under both the bad faith and totality of the circumstances prongs of Section 707(b)(3).

### A.  Bad Faith under Section 707(b)(3)(A)

In the context of bankruptcy, a "bad faith filing" is defined as "[t]he act of submitting a bankruptcy petition that is inconsistent with the purposes of the Bankruptcy Code or is an abuse of the bankruptcy system (that is, by not being filed in good faith)."  Black's Law Dictionary 149 (8th ed. 2004).  Good faith is defined as a "state of mind consisting in (1) honesty in belief or

---

[4]Section 707(b)(2)(A)(i) states: "In considering under paragraph (1) whether the granting of relief would be an abuse of the provisions of this chapter, the court shall presume abuse exists if the debtor's current monthly income reduced by the amounts determined under clauses (ii), (iii), and (iv), and multiplied by 60 is not less than the lesser of–(I) 25 percent of the debtor's nonpriority unsecured claims in the case, or $6,575, whichever is greater; or (II) $10,950."

purpose, . . . or (4) absence of intent to defraud or to seek unconscionable advantage." Id. at 713. "Bad faith may involve a dishonest debtor or nefarious acts, but such motivation or intent is not necessary. Bad faith exists if the filing of the bankruptcy was for a purpose not consistent with the Bankruptcy Code or policy even though the purpose may otherwise be lawful." In re Hageney, No. 08-04506, slip op. at 4 (Bankr. E.D. Wash. Dec. 31, 2009) (2009 WL 5217674). In determining whether a debtor filed her petition in bad faith, courts should look to the debtor's intent and purpose at the time of commencing the bankruptcy, focusing upon the debtor's conduct. Id. An analysis of bad faith under Section 707(b)(3)(A) may look outside a debtor's financial situation. Factors unrelated to a debtor's financial situation include eve-of-bankruptcy purchases, filing incomplete or false schedules, or failure to cooperate with the bankruptcy trustee. In re Crink, 402 B.R. 159, 176 n.25 (Bankr. M.D.N.C. 2009) (citing In re Parada, 391 B.R. 492, 499 (Bankr. S.D. Fla. 2008)).

### 1. Eve-of-Bankruptcy Purchases

The Debtors met with their attorney during the first week of July 2009. During their meeting, the Debtors and their attorney discussed the idea of trading in their leased vehicles and reducing their monthly payments. Then, twelve days prior to filing their petition, the Debtors purchased two new vehicles at a total cost of $69,104.15. The male Debtor testified that he purchased a Ford Edge, a mid-sized sport utility vehicle, because he sometimes transports computer servers for work and needs the vehicle's extra cargo space. This explanation is unsatisfactory. The Debtors did not attempt to explain how much cargo capacity was needed to transport a server, nor did they compare the cargo capacity of the Ford Edge to other, more reasonably priced vehicles. Moreover, the Debtors could have purchased substantially less

expensive vehicles with equal or greater cargo capacity.  While the purchase of these new vehicles reduced the Debtors' monthly payment from $1,337.18 to $1,017.06, the Debtors could have selected less expensive vehicles that would have reduced their monthly payment much further.  Despite the male Debtor's testimony that he did everything he could to reduce his monthly payments, neither he nor his wife visited any other dealerships in an effort to locate more affordable transportation.  The Court notes that by purchasing these vehicles, the Debtors reduced their monthly disposable income on the means test by $130.84, raising the specter of impermissible manipulation.  See In re McLaughlin, 305 B.R. 505, 509 (Bankr. W.D. Mo. 2004) ("The Debtors actions, however, in purchasing two new and relatively expensive vehicles on the eve of bankruptcy indicates that the Debtors likely have engaged in some calculated manipulation of the Bankruptcy Code."); see also Milavetz, Gallop & Milavetz, P.A. v. United States, 599 U.S. __, slip op. at 9 (U.S. Mar. 8, 2010) (2010 WL 757616) ("Section 526(a)(4) prohibits a debt relief agency from 'advis[ing] an assisted person' . . . 'to incur more debt in contemplation of' filing for bankruptcy . . . .").

This troublesome behavior by the Debtors tends to show that their bankruptcy was an attempt to get a head start instead of a fresh start.  Green, 934 F.2d at 570.  The purchase of the two new vehicles was clearly in contemplation of bankruptcy and supports a finding that the Debtors filed their petition in bad faith.

**2.    Incomplete and Inaccurate Schedules**

In addition to the eve-of-bankruptcy purchases, the Bankruptcy Administrator demonstrated that the Debtors' schedules contain numerous inaccuracies.  On Schedule I, the Debtors failed to include reimbursements that the male Debtor received from his employer for

8

meals, fuel, and the purchase of office supplies, which average $250.00 per month. On Schedule J, the Debtors failed to list monthly expenses for a laptop computer ($60.00), pest control services ($33.00), a security system ($36.95), and various business expenses of the male Debtor. The Debtors also overstated their medical expenses by $29.14 per month on Schedule J. On Form B22, the Debtors overstated their health insurance expenses by $173.33 per month. On Schedule F, the Debtors failed to list the male Debtor's father as a creditor. These inaccuracies manifest an intent to mislead the Court and other parties in interest and support a finding that the Debtors filed their petition in bad faith.

### B. The Totality of the Circumstances under Section 707(b)(3)(B)

Section 707(b)(3)(B) "incorporates a 'totality of the circumstances' standard, which courts previously employed as the standard for determining whether to dismiss a debtor's chapter 7 proceeding based on 'substantial abuse' under pre-BAPCPA § 707(b)(2)." Mondragon, slip op. at 1; see Green, 934 F.2d at 572. This Court has held that pre-BAPCPA cases, such as Green, remain instructive in an analysis pursuant to new Section 707(b)(3). See Crink, 402 B.R. at 170; In re Christiansen, No. 08-50871, slip op. at 2 (Bankr. M.D.N.C. Jan. 21, 2009) (2009 WL 159361). Under Green, a court is to determine whether to dismiss a case for abuse of Chapter 7 by considering the totality of the circumstances. Green, 934 F.2d at 572. The Fourth Circuit held that in considering the totality of the circumstances, a court should consider the debtor's ability to repay his or her debts, as well as review the following factors:

> (1) Whether the bankruptcy petition was filed because of sudden illness, calamity, disability or unemployment;
> (2) Whether the debtor incurred cash advances and made consumer purchases far in excess of his ability to repay;
> (3) Whether the debtor's proposed family budget is excessive or unreasonable;
> (4) Whether the debtor's schedules and statement of current income and expenses

>reasonably and accurately reflect the debtor's true financial condition; and
>(5) Whether the petition was filed in good faith.

Id.  The Fourth Circuit also stated "that the majority of the cases hold that the debtor's ability to repay is the primary factor to be considered."  Id.

### 1. Excessive or Unreasonable Family Budget

Courts look to the facts of a case to determine whether debtors have an excessive or unreasonable family budget.  The Bankruptcy Administrator asserts that the Debtors' housing payment renders their budget unreasonable and that, given the Debtors' current income, their house is just too expensive.

A debtor's budget may be excessive or unreasonable based on a high mortgage payment. In re Myers, No. 08-11744, slip op. at 4 (Bankr. M.D.N.C. May 22, 2009) (2009 WL 1456921); Shaw v. United States Bankr. Adm'r (In re Shaw), 310 B.R. 538, 541 (M.D.N.C. 2004); In re Vansickel, 309 B.R. 189, 199-200 (Bankr. E.D. Va. 2004).  In considering whether housing expenses are excessive, due regard should be given to the size of the family, their reasonable needs, and the cost of alternative housing.  Furthermore, a court should not unduly depreciate a debtor's long-standing, traditional ties to a homestead.  See In re Miller, 335 B.R. 335, 342 (Bankr. E.D. Pa. 2005); In re Beitzel, 333 B.R. 84, 90 (Bankr. M.D.N.C. 2005).

In this case, the Court finds that the Debtors' housing expenses are excessive.  First, the Debtors have a five-bedroom, 4,025 square foot home for two adults and two children.  The Debtors have offered no reason for needing such a large amount of living space.  Second, the Debtors do not have any long-standing traditional ties to their homestead, as the house was built and purchased in 2007.  Third, there is little or no equity in the home.  The current balance of the two mortgages is $441,799.00, and the home is valued between $420,000.00, which is the

Debtors' valuation, and $449,040.00, which is the tax value.  By financing their loans on an interest-only basis, the Debtors are not building any equity in their home.  Fourth, every month, $3,649.19, of the Debtors' net income is allocated toward housing expenses, which is approximately 60% of their total net income.  This Court has previously found that housing expenses that represent a high percentage of a debtor's net income are excessive.  See Myers, slip op. at 4 (finding that housing expenses totaling 74% of the debtors' total net monthly income are excessive); Crink, 402 B.R. at 172 (finding that housing expenses totaling 61% of the debtors' total net monthly income are excessive); In re Rhoades, No. 08-10758, slip op. at 5 (Bankr. M.D.N.C. Jan. 21, 2009) (2009 WL 159388) (finding that housing expenses totaling 61% of the debtors' total net monthly income are excessive).  Finally, according to IRS guidelines, housing and utilities for a family of four in Cabarrus County, North Carolina, should be no more than $1,677.00 per month, less than half of what the Debtors are currently spending.  The Debtors can find suitable housing for their family that would cost significantly less than their current home.  The Court concludes that the Debtors' budget is excessive and unreasonable.  This factor shows abuse.

### 2. Ability to Repay

The Bankruptcy Administrator argues that if the Debtors were to obtain more affordable housing, then they would be able to repay some of their debts.  An appropriate method of evaluating whether a debtor has the ability to repay his or her debts is to determine what amount of that indebtedness could be repaid in a hypothetical Chapter 13 plan.  Crink, 402 B.R. at 172; Rhoades, slip op. at 5; Shaw, 310 B.R. at 342.  The greater the ability to pay, the more likely the finding of abuse.  Crink, 402 B.R. at 173; Christiansen, slip op. at 3; Rhoades, slip op. at 6; In re

Praleikas, 248 B.R. 140, 145 (Bankr. W.D. Mo. 2000).

Prior to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA"), projected disposable income for both above and below median income debtors was determined by comparing debtors' current income and expenses as stated on bankruptcy schedules I and J. In re Wilson, 397 B.R. 299, 305 (Bankr. M.D.N.C. 2008). Post-BAPCPA, projected disposable income for below median income debtors continues to be determined by examining schedules I and J. However, for above median income debtors, projected disposable income is now determined under the means test using Form B22. The means test calculates disposable income historically, during the six months prior to the petition date[5] and deducts expenses based on IRS standards, as well as other necessary expenses.[6] The Debtors' schedules indicate that they are above the applicable median family income. The issue then is how to calculate ability to repay for above median income debtors in the context of a hypothetical Chapter 13 plan.

In In re Henebury, 361 B.R. 595 (Bankr. S.D. Fla. 2007), the court examined whether it could take into consideration post-petition events when evaluating the totality of the circumstances of the debtor's financial situation. In Henebury, the female debtor was unemployed pre-petition but began a job four days after filing for Chapter 7 relief. Id. at 598.

---

[5]"Current monthly income" is defined, in relevant part, as "the average monthly income from all sources that the debtor receives . . . , derived during the 6-month period ending on . . . the last day of the calendar month immediately preceding the date of the commencement of the case." 11 U.S.C. § 101(10A)(A)(i).

[6]"The debtor's monthly expenses shall be the debtor's applicable monthly expense amounts specified under the National and Local Standards, and the debtor's actual monthly expenses for the categories specified as Other Necessary Expenses issued by the Internal Revenue Service for the area in which the debtor resides. . . ." 11 U.S.C. § 707(b)(2)(A)(ii)(I).

12

The United States Trustee filed a motion to dismiss, arguing that the debtors had the present ability to pay based upon the female debtor's new employment and the debtors' cessation of payments for a parcel of real property and a timeshare.  Id. at 600.  The court held that consideration of post-petition changes in the financial circumstances of the debtor was appropriate when determining if the debtor has the ability to pay in a hypothetical Chapter 13 plan because the inquiry requires analysis of a debtor's actual ability to pay.  Id. at 609 (citing In re Lenton, 358 B.R. 651 (Bankr. E.D. Pa. 2006); In re Paret, 347 B.R. 12 (Bankr. D. Del. 2006); In re Pak, 343 B.R. 239 (Bankr. N.D. Cal. 2006)).  The court noted that "the very broad language of § 707(b)(3) 'was meant to give courts considerable leeway to consider all aspects of the debtor's financial situation'" and "'[t]here is no indication in the language of the statute or the legislative history that Congress meant to limit temporally the Court's consideration of the Debtors' financial condition when determining whether to dismiss a case for abuse.'"  Id. at 610 (quoting In re Pennington, 348 B.R. 647, 651 (Bankr. D. Del. 2006)).  Since post-petition events are relevant to the totality of the circumstances inquiry, the court found it appropriate to begin its analysis with the debtors' means test and then make adjustments based on their actual financial circumstances.  Id. at 612.  First, the court included the female debtor's post-petition income in the debtors' current monthly income as stated on their means test.  Then, the court disallowed expenses associated with another residence owned by the debtors and a timeshare for which the court previously denied reaffirmation.  Id.  After making these adjustments, the court determined that the debtors could repay 100% of their unsecured debt in less than 43 months.  Id. at 613.

The court in In re Mondragon, No. 05-10665, slip op. at 3 (Bankr. D.N.M. Aug. 24, 2007) (2007 WL 2461616), agreed with the approach taken in Henebury that post-petition

13

changes to a debtor's income and expenses are relevant, holding that a debtor cannot meet the totality of the circumstances standard "simply by demonstrating an insufficient ability to pay under the means test." Id.  Applying this principle, the Mondragon court deducted the expenses allowed under Form B22 from the debtors' actual post-petition income. Id. at 4.  The court then made adjustments to certain expense deductions to take into account expenses that the debtors no longer incur post-petition and a secured debt payment on a vehicle driven by the debtors' adult son, which the court found to be improper. Id. at 5.  After making these adjustments, the court found that the debtors had the ability to pay $39,430.80 over the life of a Chapter 13 plan, yielding a 34% dividend to unsecured creditors. Id. at 6.

      This Court agrees with the reasoning in Henebury and Mondragon and holds that post-petition changes to a debtor's income and expenses are relevant to the determination of whether a debtor has the ability to repay creditors in a hypothetical Chapter 13 plan.  The means test is merely a starting point, and a court should make adjustments based upon a debtor's actual financial circumstances.  The Court will apply this standard to the facts of this case.

      The Debtors listed current monthly income of $8,789.19 on Form B22.  However, that amount included a $4,000.00 bonus received in the six month period immediately preceding the petition date.  The male Debtor testified that he has no reasonable expectation of receiving a bonus in the future.  The Debtors' Schedule I shows gross income of $7,900.00 per month, but this amount did not include reimbursements from the male Debtor's employer, which average $250.00 per month.  The Court finds that the Debtors' actual current gross income totals $8,150.00 per month.  In addition, it is appropriate to make adjustments to the Debtors' expenses as listed on Form B22, keeping in mind "whether the expenses claimed by a debtor can be

reduced significantly without depriving the debtor of adequate food, clothing, shelter, or other necessities of life." In re McCain, No. 05-14382, slip op. at 3 (Bankr. M.D.N.C. June 16, 2006) (2006 WL 4458679) (citing In re Engskow, 247 B.R. 314, 317 (Bankr. M.D. Fla. 2000)). According to line 47 of Form B22, the Debtors' expense deductions total $9,360.33. The Bankruptcy Administrator argues that the Court should reduce the Debtors' housing budget to a reasonable amount, using the IRS standards as a guide. As stated above, the Debtors' mortgage expenses of $2,985.36 are excessive, and they could obtain alternative housing based on the IRS standards of $1,166.00 per month, resulting in an expense reduction of $1,819.36. Second, according to Schedule I, the current amount of taxes withheld from the Debtors' income is $1,160.00, not the $1,454.43 listed on line 25 of Form B22. The Court will use the more recent figure in calculating the Debtors' ability to repay, a difference of $294.43.[7] Third, the male Debtor testified that the Debtors' actual health insurance expenses during the six month period preceding the petition date were $455.00 per month, not $628.33. However, just prior to the petition date, the male Debtor's health insurance increased to an average of $599.19 per month. Therefore, the Court will reduce their health insurance expenses by $29.14 to $599.19. Fourth, the Debtors took a $377.73 per month deduction for the timeshare that they have surrendered, an expense which they no longer incur post-petition. The Court will eliminate this expense from

---

[7]The Court expresses skepticism over the amounts withheld from the male Debtor's paycheck, given that the Debtors received a tax refund of $10,175.00 for the 2008 tax year and are currently being audited for questionable deductions on that tax return. Line 25 on Form B22 should reflect a debtor's actual tax liability, not merely the amount withheld from paychecks. See In re Gray, No. 09-10120, slip op. at 2 (Bankr. M.D.N.C. Oct. 21, 2009) (2009 WL 3486658); In re Lipford, 397 B.R. 320, 332 (Bankr. M.D.N.C. 2008). However, the Court will use the amount of tax withheld on Schedule I, as it is more in line with the male Debtors' current income.

15

Form B22.

After adjusting the Debtors' income and expenses to reflect their actual financial circumstances, the Court finds that the Debtors are able to pay $1,310.33[8] each month toward their scheduled general unsecured debts of $31,432.37, which would provide a 100% dividend to their unsecured creditors in 32 months.[9]  This factor tends to show abuse.

### 3. Cash Advances and Consumer Purchases in Excess of Ability to Repay

A debtor's ability to repay consumer purchases and cash advances should be interpreted in a manner consistent with a debtor's reasonable expectations of repayment at the time that the debt was incurred.  Beitzel, 333 B.R. at 91 (citing Vansickel, 309 B.R. at 211); In re Moreland, No. 05-10519, slip op. at 7 (Bankr. M.D.N.C. Aug. 3, 2005) (2005 WL 1925460).  "Taken in its proper context, a court should examine the nature of the debts incurred, if the debts were consistent with the debtor's financial status, and whether there was an unexplained change in spending patterns--all of which must be considered in light of whether a debtor is taking unfair advantage of creditors."  Beitzel, 333 B.R. at 91 (citing Vansickel, 309 B.R. at 211).  However, paying the minimum balance on a credit card does not demonstrate an ability to repay debts.  Moreland, slip op. at 8.  There is no dispute that the debts in this case are primarily consumer debts, so the only issue is whether those purchases were in excess of their ability to repay.

---

[8]The Debtors' adjusted monthly gross income totals $8,150.00 and their adjusted expense deductions on Form B22 total $6,839.67.

[9]As above-median income debtors, the Debtors' applicable commitment period in a Chapter 13 plan is not less than five years.  See 11 U.S.C. § 1325(b)(4)(A)(ii).  The Court notes that based on Schedule F as filed, the Debtors would only need to contribute approximately $523.87 each month toward their unsecured debts in a Chapter 13 plan to provide a 100% dividend over sixty months.

16

Until August of 2008, when the male Debtor lost his job, the Debtors had a steady stream of income, earning a salary of $115,000.00 plus bonuses. When their new house was completed, the Debtors closed on the house despite the fact that they had not sold their previous house. For the next fifteen months, the Debtors incurred mortgage and utility expenses on both houses, without making any effort to rent out their vacant residence. Throughout this period, the Debtors remained current on both mortgages, never missing a payment. Meanwhile, the Debtors continued to make consumer purchases on credit, reaching most of their spending limits and making only the minimum payments. The Debtors incurred this debt in order to stay in their new house despite having no equity in it. After the Debtors sold their first house, rather than reduce their accumulated unsecured debt, the Debtors purchased a time share at Disney World.

Once the male Debtor found new employment at a reduced salary in late September of 2008, the Debtors made no effort to change their spending habits. On October 9, 2008, the Debtors purchased $3,365.50 of furniture on credit. On October 21, 2008, the Debtors purchased $1,190.00 in landscaping services on credit. In December of 2008, the Debtors took a vacation to Disney World, withdrawing approximately $2,000.00 in cash from their bank account. Twelve days before filing their bankruptcy petition, the Debtors traded in their leased vehicles and purchased two new vehicles totaling $69,104.15. Incredibly, months after they filed their bankruptcy petition, the Debtors took another vacation to Disney World.

The Court finds that the Debtors made excessive consumer purchases at the expense of their creditors at a time when they did not have the ability to repay or a reasonable expectation of repayment. These facts tend to show abuse.

### 4. Sudden Illness, Calamity, Disability, or Unemployment

The male Debtor was unemployed for less than two months, so his unemployment did not result in a significant loss of income. See Rhoades, slip op. at 8 (holding that female debtor's unemployment did not precipitate the bankruptcy filing when she had not worked full time in twelve years and overall household income had increased); Schmonsees, slip op. at 3 (holding that a co-debtor's unemployment, without a significant loss of income, did not force the debtors into bankruptcy). The male Debtor received a severance package which exceeded $40,000.00 after taxes during his brief period of unemployment, which more than compensated for his brief loss of income. Accordingly, the Court finds that the Debtors did not file their bankruptcy due to sudden illness, calamity, disability, or unemployment. This factor tends to show abuse.

### 5. Accuracy of Schedules

Inaccuracies on a debtor's schedules tend to show abuse. See Lipford, 397 B.R. at 338. As stated above, the Bankruptcy Administrator has demonstrated several inaccuracies on the Debtors' schedules including the non-disclosure of large expense reimbursements, the omission of a debt to the male Debtor's father, the omission of numerous housing expenses, and overstatements of health insurance and medical expenses. These inaccuracies tend to show abuse.

### 6. Good Faith

The Green factor of good faith requires a court to look to the totality of the circumstances of the debtor's financial situation. Crink, 402 B.R. at 176 n.25; Parada, 391 B.R. at 499 (only facts related to debtors' financial situation are relevant to Section 707(b)(3)(B) analysis). The Court concludes that the Debtors lived beyond their means up to and during the time of their bankruptcy, and this fact weighs against a finding of good faith. The Debtors continued to take

vacations not only after they experienced a reduction in income, but also after they filed their bankruptcy petition.  Their desire to keep a house that they cannot afford also demonstrates that they have continued this behavior post-petition.  They filed their Chapter 7 petition with the intention of paying nothing to their unsecured creditors.  These circumstances demonstrate that the petition was filed in bad faith.

## IV. CONCLUSION

The standard for granting a motion to dismiss pursuant to Section 707(b)(3) is no longer "substantial abuse," but rather just "abuse."  The Bankruptcy Administrator alleges that the granting of relief would be an abuse under both the bad faith and the totality of the circumstances prongs of Section 707(b)(3).  The Court finds that allowing the Debtors to continue in a Chapter 7 would constitute an abuse of the Bankruptcy Code within the meaning of Section 707(b)(3), under either prong.  The eve-of-bankruptcy purchases of two new vehicles and the large number of inaccuracies in the Debtors' schedules evidence that the Debtors filed their petition in bad faith.  In addition, as discussed above, a review of the totality of the circumstances of the Debtors' financial situation demonstrates abuse.

This opinion constitutes the Court's findings of fact and conclusions of law.  A separate order shall be entered pursuant to Fed. R. Bankr. P. 9021.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
WINSTON-SALEM DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| RICHARD W. HORNUNG and | ) | Case No. 09-51461 |
| KRISTIN L. HORNUNG, | ) | |
| | ) | |
| Debtors. | ) | Chapter 7 |
| _____ | ) | |

**PARTIES IN INTEREST**

Richard and Kristin Hornung

Bryan P. Hayes, Esq.

Robert E. Price, Jr., Bankruptcy Administrator

Bruce Magers, Chapter 7 Trustee